Good morning, your honors. My name is Heidi Lynn Lambrose and I represent the appellant Stephen Zirko. Good morning. May it please the court, Jessica Ball, Assistant State's Attorney on behalf of the people. Each side has 15 minutes, but you are the only people here today for the arguments. I'd like to confine today's argument to Issues 1 and Issues 2 and, if time permitting, the second part of Issues 3, the McCauley issue. But, of course, I'd be happy to answer any questions about any of the issues contained in the brief. As Stephen Zirko's first-degree murder trial, the State's theory was that Mr. Zirko, in a visceral, personal attack alone, killed Mary Lacy and Margaret Bailoff in the Lacy home. All of the evidence presented at this three-week trial was devoted to proving that Zirko personally killed these women after failing to find someone to kill Lacy. Despite the State's theory that Zirko personally killed the women, and despite that Zirko was charged only as a principal, and despite that no physical evidence or witness put a separate, second, identifiable person at the scene, the trial court allowed the jury over defense objection to be insulted that they could find Zirko guilty of the murders based on his accountability for the actions of an unknown, never-identified person. In other words... Case law demands that a person be identified as the other person, to be the one who's accountable. Case law demands that the State prove that there was another body, another human, another person there, although in many cases, we don't know the name of the person, and that person's never charged, as in the Cook's case, the state's site, so it's just an arm, there is evidence suggesting that more than one person was in that room that the defendant shared an intent with to commit the crime, and that's just not present here. What's your best case... I'm sorry. Go ahead, counsel, or judge. What's your best case of the proposition that they have to show a second person was actively involved in the murder? I believe the Garrett, this court's decision, people view Garrett, where you have to identify the principal. You can't be held accountable to a phantom. In order under our statute to be accountable, you have to share an intent with a person, or a common design or plan with a person, and the state didn't identify who this potential person would be. We don't have evidence such as Mr. Zirko saying I had a co-defendant. We don't have a witness saying I saw two people walk into the building. Ms. Lambros, what's the natural inferences that could be drawn from the fact that Mr. Zirko was actively recruiting or trying to find someone to kill the victim for some period of time before the victim was eventually killed? Can an inference be drawn that maybe he did find somebody? I mean, the fact that the person isn't identified, is that crucial, or can inferences be drawn that he was so actively looking for someone to commit this crime, and coupled with other inferences at the scene, such as, you know, they found a footprint that didn't match his shoes, there was a tire print that didn't match the car he was driving, and those kinds of things. Could those inferences be used to support the state's theory? I mean, the inference drawn from the solicitation counts was that Mr. Zirko was trying to get Mr. Chad Larson to help him, and he asked kind of various people. But the theory was that after that failed, Mr. Zirko personally planned these murders, and he was the one who came into the house, he was the one who personally did this. The rest of the evidence, there was one gun used. There wasn't separate guns used. There was one knife used. And again, their theory, coupled with the fact that they failed to identify who he hired, they failed to even say that he had a conversation post the Larson melee that would suggest that he was continuing to look for someone to hire. He gave an alibi, right? Yes, he did. Yeah, and so then if for some reason, again, these cases aren't tried to the judge and they're not tried to the lawyers present or to the appellate court. They're tried to 12 pairs of shooters, strangers off the street, nobody knows anything about except their address. And they come and they sit down in these two rows, and the attorney's job is to prove beyond a reasonable doubt in a criminal case these 12 complete strangers of whom they know nothing, that this person did this act, in this case, a murder and solicitation to commit murder. And so in this case, isn't it conceivable, within the realm of possibility, that a juror might buy what you concede to be a false alibi? Is it conceivable? Well, again, I believe false alibis should not have been admitted, but Mr. Zirka's comments of the state used those false statements to prove that he himself was on the road, that he himself was in the car. That's absolutely true, but couldn't a juror, that's the question now, the question I'm asking is, couldn't a juror have decided he didn't do it via an alibi? A juror might have concluded that he didn't do it because he had an alibi, but the state would still have been required to prove who actually did do it. Well, let's look at that. A 2001 Illinois Supreme Court case, People v. Cooper, reading, further, in contrary to the defendant's contention, a defendant may be found guilty under an accountability theory, even though the identity of the principal is unknown. And I'm saying to Illinois public, where they have no idea who shot these guys. These tend to arise, of course, in gang shootings, where 12 guys walk down the street and shoot 12 other guys. And you have no idea who shot them. Usually it's two guys, usually it's 12. You have no idea who shot them. And yet that's fine. You don't know their names. Which of the two people? So we do know, and Cooper did know names. We know it was either you or Cooper. No, they had no idea who did it. And Banks didn't know it. Or the case she cited, where an arm came around. Nobody knew who that guy's name was. At least nobody who testified in court said, and the arm belonged to June Bug or whoever it would have been. Nobody knew that. And yet that was affirmed. Well, the court in that case found that the defendant entered into a common design and a plan. Entered specifically intended to enter into a plan with the certain others to shoot at these gang members that he trapped. And his plan was to trap these gang members in the vestibule. And he was standing next to the arm, which was never identified. We don't know who that person was. But we know it was an actual human being who was there. And we know that from the court's decision, that when they were shooting at the same time into the vestibule, that shooter, that arm, didn't shoot at the defendant. It was logical to assume that the arm and the defendant were working in concert and were working together. But again, the witnesses identified two separate people in the room. Not just the defendant. There were two separate people identified, the arm and the defendant. Let me ask you this, counsel. Does the state's argument suggest we extend the theory of accountability to oneself? Because wasn't the focus of the trial that he was the one that was the perpetrator? And so does it seem that the state's argument would say he was the one who was accountable to himself because he's the one that did it? They seem to suggest by arguing in their closing arguments that because he may have had help in ringing the doorbell, that his actions as a principal in killing the victims would make him accountable to someone who rang the doorbell. So exactly that. It's kind of contrary. If he was the principal, then he was the principal. And he committed the crimes. It doesn't matter if maybe somebody rang the doorbell for him, which, again, they have no evidence and no proof of, no fingerprints of another person. So they're basically saying maybe he wanted to hire someone sometime. We don't know who that person is. But if he wanted to, if he intended to, then he can be found guilty under a theory of accountability. Let's assume for a moment that this was error, that giving of this instruction. What was the prejudice to the defendant here? Well, the prejudice here is you have a jury. The state concedes that their evidence wasn't necessarily, I believe still the evidence was not so conclusive of defendants involved as the principal. You have a jury, 12 people, who are looking at these solicitation facts and looking at the fact that he had Mr. Larson and that he was trying to hire Mr. Larson maybe. And you have 12 people sitting on the bench who maybe one of them thought, maybe one of them thought, you know, I don't know if he did it. Maybe he had his alibi. Maybe he was home. But I sure think that he's responsible for it because he wanted it to happen, because he thought about it happening, and because he tried two months prior to the murder to maybe have someone else involved in it. So the danger in this verdict, in this general verdict, is that we don't know whether one juror voted on a constitutionally impermissible ground. And if one juror found him guilty solely under the theory of accountability, although the state failed to identify who he was accountable for, then that's impermissible. And also, again, we go back to the... I had a case for that last proposition that it is the state's burden to show that no juror believed in accountability or found him guilty based on accountability because they did it to be error. Do you have a case that says that? There is no case that says that. I have a case called Batchelor which says the opposite. You know, error would have been harmless. Again, the same argument about who knew who, talking about whether accountability should have been used. And the appellate court said error would have been... Furthermore, the error would have been harmless because sufficient evidence exists to find Batchelor guilty as a principal. So if there's sufficient evidence to find the person guilty as a principal, the fact that an accountability instruction is used is not a reason to reverse. And the evidence in the standards we have to use as found as well settled in Beltran and other cases is the slightest amount of evidence is sufficient to require, to allow, I should say, of the state to argue accountability. That's the standard, slightest evidence. Is that right? That's right, slight evidence. So the slightest evidence. In the other case you cite, was there any evidence that somebody else had done it? And I suggest in the case that you cite, although I pulled every case and I thought it was cited. I don't have Garrett. There was no evidence in Williams or other of these other cases, Cicciolo or the Cottonside burglar case, that anybody else was involved, then accountability should not be used. Here there is slight evidence, isn't there, not through his machinations and through his alibi, that somebody else may have killed this person at his behest. Well, the standard, again, is harmless and a reasonable doubt. And we maintain, as we do throughout all of our briefs, this evidence is not overwhelming. Before you get to reasonable, before you get to harmless, you have to find error. So what error was there in this case? Was there slight evidence that somebody else could have killed these two women? No. Okay. The only evidence that... Excuse me. You're saying there was no slight evidence that somebody else could have killed these two victims? There was no slight evidence that anyone else could have killed these victims. And the state even, again, this is a last minute, we need an accountability instruction, because the jury may be able to infer. They actually couldn't point to anything tangible. What they do point to is the hire a hitman, and they point to the solicitation evidence, which, again... You know, there was a lot of evidence that, you know, the victim, Mary, had an order of protection. There was no force of entry into the house. Mike included that she was going to let a guy into the house that she had an order of protection against. So that's where it came up that maybe somebody else rang the bell for him. And, I mean, it was clear that somebody let them in. Is that some evidence? The state does make that argument that somebody could have let them in. And they also make the argument that maybe Margaret went outside for a cigarette, and that's why the door was open. But, again, that person who rang the bell and allowed him access, there's still Mr. Zirko was the principal in entering the home and killing the victims. The defense argument was down, so it was an act, right? So when the defense attorney for Mr. Zirko got up, he argued that he not. Mr. Zirko didn't do it. So, again, isn't the battle a joint gun? Isn't it up to the jury to decide who's right, the many witnesses or the defense argument that he didn't do it? And if there's any reason, based on that, couldn't a jury have listened to Mr. Zirko's attorney and said, you know what, I believe Mr. Zirko's attorney. He had some holes in his case. I'm going to find him not guilty. But, again, the accountability instruction, in Illinois you have to prove that the defendant and the person he's accountable to, the person, shared an intent. And in order to do that, you have to say who that person was, or a common design or a plan. In Illinois, it can't just be some ephemeral, oh, maybe you had some help. Maybe somewhere. It has to be a person's intent. So in this case, you have a fellow that's been asking for many months, chiropractors, strangers, would you please murder my wife? Probably unsuccessful. He's so vociferous in this, the police actually confront him and say, we have information that you're trying to hire people to murder your wife. We know if you kill your wife, you did it. Maybe you shouldn't kill your wife. And he goes out and murders her anyway. One month after he pays for their life insurance policies. Now, he didn't change the beneficiary. They paid for life insurance policies, making him the owner on his mother-in-law's policy one month before he allegedly murdered her. So going to intent again. He goes on the line four months before, hireahitman.com, and says, I'm looking, because he's looking for a hitman. Wouldn't that indicate, to any rational person, that they would share an intent with the killer of his wife and mother-in-law, this intent that they'd be murdered? If the state can show who the actual killer was. So again, Williams specifically says that's not so. So, no, you don't need to show that. Well, in Williams they found that because all of the evidence suggested that the defendant was either a principal or misidentified as the shooter. In Williams you had two people who saw the defendant come up to the victim and shoot at the victim. And the defense theory of the case was I was misidentified, it wasn't me. So in that case the court found that the accountability instruction was shouldn't have been offered. That's really similar to what we have here. All of the state's evidence points to Mr. Zirko. Well, in Williams, he was the hitman. So unlike our case where Zirko's theoretically, possibly, conceivably not the hitman, in Williams he was either the hitman or nothing. And his argument was I'm not the hitman, I'm a nothing, and they put in accountability anyway. So somehow he, who all the witnesses said, I saw him, Williams, shoot the person, wait outside, walk up and shoot the lady. That is graphically different than here where we have no, what direct evidence do we have? Any eyewitnesses see Zirko go in and shoot him? No. Okay. So it's a circumstantial case. It's an entirely circumstantial case. But again, Mr. Zirko is not required to say I am the principal in order to defeat an accountability instruction. Why don't you have some other points you want to make? I don't want to cut you off if anybody has any questions. I guess I just wanted to stress, and this was asked, this is basically, it's a harmless error analysis. It's a harmless and reasonable doubt. And again, this is a weak circumstantial case. There's no physical evidence. There's nothing tying Mr. Zirko to the scene. There's no biological evidence. There's no fingerprint. There's no anything that connects or puts him in that house on that day. And we also don't have a confession. And we don't have any eyewitnesses who said I saw Mr. Zirko walk into the house that day. So under the harmless error rule, the evidence in this case was certainly not overwhelming to convict Mr. Zirko. Was there a great deal of intent? I mean, overwhelming, besides $650,000 in cash, his burning desire to have them murdered, which is clear from asking numerous people to murder his wife. That doesn't make it a strong case that he wanted them dead, at least his wife, when she turned up dead. It's a good place to start looking at. I think it's a great place to start looking at. I think he knew that that was a great place to start looking at. I'm not denying that he had a motive. And that he had a false alibi, which you can see in your brief is a false alibi. Yes. Again, his intent and his possibility that he possibly wanted her dead and that they had a very contentious life, that's not in dispute. But the false alibi isn't there at all. It goes to actually killing him. And the argument really is he killed him. The argument that this is not is that the evidence is so overwhelmingly strong that he did the murder, the jury should not have been fooled or given this other option to find that he's merely accountable. But the state's evidence was he did it. Right? No, I agree with the state. The evidence was not conclusive that he was the one who walked into that house and shot. But there has to be more than just the speculation where you seem to have the best motive to kill this person, therefore you probably killed this person. So we're going to string together a bunch of little facts, random facts, that you were kind of near the house and that you did some searches on the Internet to convict you in a capital case of murder of two people. Again, we don't have any, and this was a massive investigation. So are you suggesting that circumstantial evidence does not convict in a murder case? No, absolutely not. The circumstantial evidence does not. It is true that this case is entirely circumstantial. However, there's a lot of circumstantial evidence. It's not just like one piece or two pieces. There's a lot of circumstantial evidence here. When taken together, is that enough? No. I mean, we did raise a reason for that argument in the brief. But taken together, it wasn't enough to convict him. So are you trying to eat your cake and have it? Either he was the actual killer or he wasn't. But it seems like in the court below you're making one argument, and here you're arguing something else. So I'm not sure that you're trying to eat your cake and have it. Well, the defense objected to this instruction, and they said there's no evidence that he hired someone. The state's not proven that anybody else was in that house. There's nothing, again, other than they don't have to charge it in the instruction. There was no evidence up until the last minute that the state itself said we need an accountability instruction. And they argued that because of the hire the hit man, a little bit of GSR, and a comment that Mr. Zirko made about his father, which we know not to be true because Mr. Zirko's father could not have helped if he was at work, that's where the state pushed for this instruction. And they admitted the evidence was not so conclusive that he was the principal. So, hey, we have all this great stuff that he wanted to kill his life. Let's see if we can attach that intent and motive and put it in the accountability instruction. But back to Justice Conner's question, what's the prejudice? Assuming that you're right in this error, what's the prejudice? Mr. Zirko was clearly prejudiced because there was a danger that one juror, and again, the evidence in this case was not overwhelming. So if somebody thought that he was accountable or legally responsible for the death. What's the prejudice, Ms. Lambert? Mr. Zirko should have a new trial on his murder accounts. Well, I know that's what you want. What is the prejudice that flows from the fact that this instruction was given? That there's a danger that a juror rendered a constitutionally impermissible verdict and found him guilty under a theory of accountability, which they were not permitted to do because there was no evidence of accountability in this case. In order to give an instruction, the state has to show certain things. That you intended, that you had a plan, that you colluded in some way with the person that you were accountable for, and they didn't show that. So are you saying it's as clear as, but for this instruction, he would have been found innocent? Is that your argument? But for this instruction, we can't be confident of what he was found guilty of. We can't be confident in this verdict that he received a fair trial. We don't know. We don't know what happened. They were given this instruction and allowed to determine, although the state offered up no second person, they were allowed to evaluate the evidence in light of, oh, I think he probably did it. I think we all think he probably did it. If he didn't hire Chad Larson, he probably hired someone else. Relieving them of their burden to prove who that second person was and to prove that he intended to assist or aid this other person. It's not just simply the name of the person or the probability. The accountability statutes required another person, and they did not do that in this case. And the danger is that one juror, who maybe didn't think that it was him, who did the actual physical, was the principal in that house, thought that, well, he probably hired someone else and found him guilty of capital murder and for his natural life sentence. That's the danger. Next issue. Again, I touched on very briefly about the hire the hitman evidence that was used to find Mr. Zirko accountable. But in this case, the state was allowed to introduce totally irrelevant and highly prejudicial Internet evidence of non-criminal websites to basically prove that Mr. Zirko intended to solicit Mr. Larson and intended to kill Mary Lacy and Margaret Blaylock. Specifically, which websites were prejudicial and not relevant? Not relevant. Not relevant and prejudicial. So, not relevant, if he's looking for a mercenary, that may not be relevant. But it's not against the law to look for a mercenary. So, you know, this is not a porn case. So, for example, if they brought in a bunch of porn sites, that would be bad. It's not relevant. What sites are you complaining about that were both prejudicial and not relevant? Well, if you look at the websites that were, and again, we have websites and then we have web searches, where all Mr. Zirko did was just type some words into a search term and up top the search engines without him accessing them. And what were the words he was typing in? Well, he typed in hire a hitman, which produced a web page. Is that relevant to a charge, a solicitation to commit murder for hire, that you went on your website, Googled hire a hitman? Is that relevant? I don't think it's relevant, no. Okay. Because, again, he's just typing in these words very simply without context of what he's doing around these words. I'd like to start with the most prejudicial and the most totally irrelevant evidence offered. In September of 2003, the state was allowed to introduce that he went to a website containing ether, GHB, unconscious liquids, things that had absolutely no connection whatsoever to the crime as committed. In order for evidence to be made. But on the planning stage, a year before he murdered somebody, might he be thinking, since he's asking chiropractors to murder his wife, could he also be thinking of other ways to maybe, since the chiropractor is not following his request, maybe he'll have to do it himself and maybe he'll have to knock her out? This was in September of 2003. This was well before even any of the beginning of the solicitation happened. But, again, that's new relevance to the crime as charged. Then how is it prejudicial to him that he's looking up GBH and anesthesia? Because the state made comments in closing arguments that he's basically a bad man, that he was doing exactly what you suggest, although he doesn't have any connection to the crime as charged. That he was looking up these liquids. And how would that be not harmless where he's actually also on a website saying, how did a high rate hit me? Well, there's multiple websites. And I don't think it's an all or nothing proposition that I'll have to go and, or for it to be prejudicial. To start at the beginning, you know, the evidence eliminator site, which has nothing to do with the state argument, he's Mr. Evidence Eliminator and making suggestions that he found out how to eliminate, you know, blood stains and bleach. That has nothing to do with how to commit a murder or your intent to commit a murder? How to hide a murder has nothing to do with murder? He didn't type in how to hide a murder. How to eliminate evidence. That has nothing to do with the crime? He typed in evidenceeliminator.com, which is a website that uses to kind of scrub, you know, computers, which again he didn't do here because all this evidence was found. The jury was never told what this website was. They were just given the name Evidence Eliminator. Evidence Eliminator is eliminating evidence. I bet you. Counsel, what's the standard of review here on these issues? It would be at the discretion of whether the judge, you know, what we're saying is totally irrelevant evidence to be admitted against Mr. Zerko at trial. And, again, what the state offered here was 32,000 potential pieces of evidence. And, you know, as the appeal court makes kind of known when they're exploring in the context of pornography and sex crimes, what the state is going to offer needs to be relevant to the crime charged. But it's not a new rule. It's not an expanded rule. But in order for evidence to be relevant, it has to be connected to the crime that's charged here. In order for us to agree with you, we would have to find no other reasonable judge looking at the crime that was committed here and the fact that Mr. Zerko had, for some period of time prior to his wife and mother-in-law being killed, had been soliciting, talking to people, hiring someone to follow her, all of those things. No other reasonable person, considering all of those facts, would find that these websites had anything to do with the furtherance of his plan to eventually commit this crime. That's what we'd have to find. You know, we have to write something in order to publish this and do what you want. I mean, how can we, give me a roadmap. How do we get from here to there on those facts and on the theory that you're asking us about? Well, I think the PEO gives a very good roadmap for this kind of new emissions. This is brand new evidence. I mean, this is only the second time in Illinois that any court has evaluated this type of evidence. And the first time was non-criminal websites. The PEO provides a good roadmap for starting with the basics, the relevant evidence that makes a material fact more or less true or a fact of controversy more or less true. And through that, they found that if the websites viewed or the search terms used emulate the behavior or connect the defendant to the crime as charged, then it is more likely than not to be relevant. And we don't have that in this case. They will also suggest that when you're looking at this evidence, which is ephemeral, I mean, people look on the Internet for, I mean, any number of things, to track their kind of thoughts or they follow links. I get links all the time that I don't even know where they're coming from. In order to make sure that this evidence is relevant and tied to the crime, either should emulate the crime as committed or show peculiar interests of the defendant. Show something out of odd or, you know, there's something aberrant about all of this information, that somebody is totally devoted to, as in the PELO case, very violent pornography and these certain images. I think that provides a good roadmap. When you're talking about things that we can't even be confident that he really looked at or read. I mean, he typed in some words which maybe took him, oh, 20 seconds and then closed it. You know, some of these things that show one-day interests, which when you look at them in the context of how he viewed some of these websites, the Hire the Hitman, the gun show websites, he also looked at the Sopranos website. He also went to look at counterterrorism. He also looked at martial arts and war crimes. Without the context, it should not have been admitted because, again, I don't think there needs to be proofs and explanations or not. Well, the context is he's trying to hire a hitman. He went on the web and looked to hire a hitman, right? That's the context we have, is it not? He's charged with solicitation to commit murder for hire. He's on the website saying, hire a hitman. He typed in the words, hire a hitman. Words have meanings in criminal law. Do they not, Ms. Lambert? Yes. He typed in the website, hire a hitman, but he didn't access any of the links that came up from a hire hitman. Are there any of the Internet searches that are relevant? I think that there's definitely more that are arguable to be relevant than because of the facts of the case and because of the circumstances and the nature of the crime. The gun shows the hire the hitman maybe could show his intent as far as the solicitation of murder case. But, again, we don't have any evidence that he hired a hitman in the murder case. We have two separate trials here. But, you know, some of the things like going to a spy store or a private detective, that has no relevance to what happened in the actual murders themselves. But how's he harmed by it? I agree with you. You're absolutely right. How's he harmed by this? Would a jury be more likely to come back with an erroneous guilty verdict because they were told he looked into hiring a private eye? I would think that a jury, given the nature of the facts here, and they were told that they could use this evidence to establish his motive and intent, would look at him as kind of a creepy guy. This is a guy who spends his entire Internet usage looking at creepy things, which, again, private eyes aren't creepy. Okay. You think private eyes are creepy, but it's not relevant that he's looking at hiring a private eye. I don't know. I mean, possibly. I can see a juror kind of being only given these websites and not given the context around them, being like, wow, this guy spends his entire amount of time looking at Ether and private eyes and gun shows, which isn't true, which is just a small fraction. What difference does that make? When people commit murders, they generally only do that for a minute or two or three of their long lives. And so you're suggesting that the jury should have been informed of his 50 years of not murdering people, right? Well, it has to be relevant. It also has to be connected. It can't be too remote. Some of this evidence was 15 months before the murder happened. And the motive and intent has to be to the crime when it was committed, not just this general kind of ephemeral, in my entire life I've had this kind of motive and intent. It has to be tied to the crime. What the state's trying to do here is use, again, for anybody, use whatever you've looked at on the Internet for your whole life and cherry pick websites and say, oh, this shows your intent, this shows your intent. You get pulled over for a DUI case, let's just say, five months ago you bought a case of wine on the Internet. That goes back to the justices, unlike me, they're more polite, and saying, well, how does that affect this case? On the facts of this case. So did the trial court, in this case, abuse her or his discretion in allowing hire a hitman to come in, as opposed to some unknown judge in some unknown DUI case may let something in? That's our standard, abuse of discretion. What did this judge do? I believe that this judge allowed irrelevant and prejudicial evidence to come into trial that had nothing to do with the charges in the case. And considering the weaknesses of the state's case and the lack of physical evidence, coupled with, you know, the inappropriate, you know, the false alibi statements that were made, it could have, it did impact this jury. And, again, this case is closely balanced. When you don't have, when you have all just circumstances and, you know, connecting things but you don't have any actual real proof, this case is closely balanced. Do you have a third argument? I want to hear you scream. We have plenty of time. Well, great. The first point that I did want to address is the McAuley issue, which is contained in Issue 3 in the brief. And the argument is that Mr. Zucker's Fifth Amendment rights were violated when his attorney, Patrick Rudin, was ready, able, and willing to counsel him and presented himself in front of the police at 6.50 ready to advise Mr. Zirko. Mr. Zirko, between 6.50 and 7.35, made a very damaging, highly damaging, false alibi statement that he was home sick all day, that he never left his house. Example. You know, how do we gauge that? That whole thing hinges on the credibility of, the credibility question, where Mr. Rudin, attorney Rudin testified that he didn't have his watch on that day. So he wasn't for sure, he wasn't certain what time he arrived there. The police officers, on the other hand, you know, logged it in and said, here's the time he arrived, and I think they said he arrived at 7.25 or 7.26. The trial judge said, well, I believe the police officers because they have, you know, a procedure and the sergeant said they have a specific procedure. How are we as the appellate court going to go back and say, well, the trial judge was wrong? I mean, how do we get to that on the argument that you're making? Well, Pat Rudin testified that he came in at 6.50 and he wrote it down in his notes, which were submitted to the judge. And he didn't have his watch on him, but he had his cell phone on him, and he recorded the time at 6.50. He walked up to the desk sergeant and said, I'm here, presented a card, and then came back. Now, the state's evidence to the contrary, and, again, that's evidence that he was through the door at 6.50, was Commander Stewart, who wasn't there, who wasn't at the front desk. Again, the desk sergeant was never called. The people who Rudin initially spoke to were never called. We have the commander saying, I had a rule in place that I was to be notified when an attorney was there. But he also admitted he didn't even hear the first page, that he had to have a co-commander come knock on his door and say, oh, there's an attorney here. And, again, McCauley instructs us, it's not that they were being nefarious, it's not that they were trying to hide anything. But at 6.50, a lawyer was there. He wrote it down. The judge found him credible. The only reason that the judge found is that I don't believe that you can make it from downtown in a loop to Glenview in 50 minutes. Again, none of that evidence was offered. But did he not remember other things? He didn't remember what the police officers looked like who were behind the desk? What were other things that he didn't remember? He didn't write down the names of the officers that he initially gave his card to. He didn't remember whether it was a male or a female. Yeah, he didn't remember those facts. He wrote down the time, which he thought was sufficient. He's a member of the bar. That's why the judge didn't find that he made it up or that it wasn't true what he wrote in his notes. But, again, the state didn't rebut that. All they have is the commander saying, it was my policy. But we don't have any proof that that policy was actually followed. The state did rebut that because their evidence was contrary to what Mr. Reardon testified to, and the judge believes the state's version. I'm just trying to figure out how do we, as an appellate court, not having the evidence in front of us, say, Well, we think the judge was wrong, and Reardon's version of what happened was right. How did he do that? Well, Reardon's version was 6.50. The commander didn't say it wasn't 6.50 because the commander didn't know what time he walked in the door. What he said was, I got a knock on the door at about 7.20 saying that there was a page, a page that he didn't hear. And as he was hanging up the phone, he was downstairs talking to the victim's family. Then he walked up. There's no evidence about what happened between 6.50 to 7.20. It's just that the commander didn't know that Reardon walked into the door. But there were people that they could have called to rebut this. Again, it was by clear and convincing evidence. The defense presented Attorney Reardon who said, I wrote down 6.50. I walked through the door at 6.50. I handed my card, and I sat down, and I waited. I went back up to a different desk sergeant. Maybe it was shift change from 6.50 to 7.10 or 7.15. And the second desk sergeant was the one who did the page, and the co-commander came down. But without the testimony, I think the better witness would be the desk sergeant. Why didn't the desk sergeant do it? Who would be a better witness? In your brief, page 39, after he's read his Miranda rights, Zerko specifically told the detectives he would not waive his rights. That's disputed by the cops. They said he did not waive his rights. He did waive his rights. But then, and we're not speaking about Lacey on counsel's advice. He comes down and says, I'll go with you. My lawyer told me not to talk about Lacey with you, which makes a lot of sense. He has a long history of domestic violence and alleged domestic violence with his married and deceased wife. And so then at the top of 40, you go over what the police asked. And they asked him a number of questions, 45 minutes about his kids, where he lived, his family, what his parents did, his job, his dating status, his cell phone number, what phones are in his cell phone, whether he owned a gun, FOID card. They asked him about his car, where the car was. They asked him where he was that day. And Zirko then gives the police a false alibi statement that he's home all day because he was sick. And he told them between 10 and 11, when the murders were committed, he was on the computer checking his e-mail. Now, did any of that involve Lacey? It did not involve Lacey, no. So the police didn't ask him about Lacey. He said, I won't talk to you for my lawyer's advice. I'll go with you, but I will not discuss Lacey. And they asked him for 45 minutes, never asking about Lacey. Is that right? They never interrogated him about the nature of the crime, no. They asked him a bunch of general questions. Or about Lacey, right? So they understood, apparently, that he was saying, I won't talk to you about Lacey, and they didn't ask him about Lacey, did they? They did not ask him about Lacey, no. Then how is it that they violated his rights by asking these other questions when he didn't object to the other questions? He said, my lawyer tells me I can't talk about my wife. We won't ask you about your wife. Well, the problem with all of this is we don't need that type of evaluation. We have the lawyer who is present and ready to counsel him. Well, yes, you do. Before we get that far, what are your rights? They obeyed what he told them. They listened. They gave him his address. They followed his restrictions on the interview. My lawyer doesn't want anyone to interview me about my wife. We won't interview you about your wife. Okay. And he talks for 45 minutes, jangling lots of inane but theoretically important stuff, and at some point this horrible false alibi that blows up in his face at trial. He was Mirandized. He was asked questions about where he was, his presence, and that was incredibly damaging. He was, but didn't violate his rights. He said, I'll talk to you about those things. I just want to talk to you about my wife. But he's a little bit more unsophisticated than the officers who had the choice of not talking to him at all and waiting for counsel to arrive. And is that the standard that police are required to never speak to a suspect? No. When they're willing to speak to them? No. As Mr. Zirko said he was. Yes. Mr. Zirko said he was willing to talk about, again, but Mr. Zirko, who they're questioning, put himself in, right, what blew up in his face, turns into a massive amount of evidence offered about a couple of lines that he said, which is where he was, which I would say is directly related to Lacey. Where you are when your wife is killed is directly related to the crime itself. He didn't see in this detail. During the exact hours when he was killed, I think that's relevant to Lacey, again, and they didn't follow it. It's absolutely relevant. There's no question it's relevant. But it's also, was it in violation of their parameter he set? Mr. Zirko set the parameters of the interview, which the police obey. Well, that's also not the standard of whatever the defendant says. The standard is in the McCauley whether or not, when you're denying this person access to counsel, who's waiting for counsel, and doesn't know where this interview with these two officers and thinks that counsel's on his way, and he is on his way, he's actually sitting in the police station, and you're not allowing him access for whatever reason. What is that? The attorneys or Mr. Zirko? Mr. Zirko's right. They have an attorney present with him when he walks in the door. Can I ask you about the Miranda waiver, the effect of that? What is the effect of a Miranda waiver, the signing of it or not signing of it? I think Mr. Zirko, again, if you want to call it, set the parameters of what he was going to be talking about. He refused to sign the Miranda waiver. At that point, did he invoke his right to counsel? I think he invoked his right to counsel when he said, my lawyer is going to be meeting me at the police station. I'm waiting for counsel. I think that the police knew that, and he knew that, and everyone was kind of waiting for Reardon to walk through the door. Well, on the one hand, he invokes his right to counsel then, but then he answers questions without his counsel present. Right, about certain things that, again, leading down the slope, turned into creating this false alibi for him. Again, I don't think it was a very good idea that he said, I will talk to you only about certain things, but he was also waiting for his lawyer, and his lawyer was there, and the lawyer should have been sitting in that room with him while those questions were being asked. If he says, no, I won't sign, but I want to talk to you anyway, what's the police required to do? Ask him about, you know, just the bears. And we're not talking specifically about waiting for counsel. They pretty much did. They didn't ask him about Mary or her mother or anything. They asked him other questions. Who are your children? What kind of car do you drive? You know, where do you work? Do you have a job? Those kinds of things. That's kind of like asking him about general justice. The fact that he implicated himself by giving a false alibi during that time, I mean, I'm struggling to figure out how does that make this a violation of his right to have counsel present when he's talking to the police and he shows his teeth and then he says something that's damaging. I mean, I'm not connecting the dots, and I want you to do that. Well, he certainly had a right to have counsel present when counsel was there, and they had no right to deny him access to his counsel. But the questions asked were more than just general questions because the police were asking him basically what happened this day, where were your kids this day, what about your car, things that ended up connecting him to this false alibi statement. Was it then impermissible? I believe it was for them to continue in that vein. I believe it was, again, more than just because he was waiting for counsel and he invoked his right to counsel and he intended to have a counsel present with him when he spoke about what he did that day, where he was. He knew he was the suspect. I mean, everybody knew that. And they knew that too. Is there a case that says if the defendant invokes his right to remain silent and then you get him talking, then it's okay, the cops don't have to cover their ears and they can listen? Yes, they can listen. So isn't that what happened here? Yes, but he also, again, the flip side of the coin is that, you know, counsel was ready, counsel was there to provide him, hey, don't answer that question. Well, some period of time, but we don't, therein lies the problem. There's a real dispute as to when he said this and when counsel arrived and when they brought counsel to the interview room and the trial court. This is back to my original question. The trial court heard all of these various people saying what they did and at what time and what the procedures were. And he said, well, you know, I find the top version of what happened here more credible. How can we go back and say, on what basis would we say the trial court was wrong? Because the trial court based its ruling that Mr. Reardon, who he did find credible, he says you're credible, on his own personal information about how long it would take to drive from the city of Chicago to Grandview, which is impermissible. There's no evidence offered that it couldn't have taken him this long. You know, number one. Number two, he said, oh, I believe that this policy was followed, that everyone would have followed it. But Commander Stewart, he wasn't the proper person to say whether or not his policy was actually followed to the letter. Again, the detectives who are, you know, interviewing and interrogating Mr. Zirkle, they have no idea who's there. They have no idea, you know, whether a lawyer's there or not. And if you look at even McCauley, that lawyer walked to the door and said, I'm here, here's my card, and was told to wait. And that's the critical point. And Reardon credibly testified. I wrote it down. The notes were presented to the trial judge. And that was not rebutted. That was clear and convincing evidence that he was there at 650. Get back to us substituting our judges for what the trial judge, as the trier of fact, found during that hearing. How could he do that? Because the trier of fact based its conclusion erroneously on its own personal opinion. That's not what the state says. Well, one of his, he said, I just don't believe you can come from Chicago to Grandview in 50 minutes. I don't think you can do that. And then they said, I believe this policy was followed. Although the person who testified that his policy was followed was the person who said, I have a policy. The followers of the policy, as it were, weren't called to testify that, yes, this was scrupulously followed. And he even said that he missed the first page. The commander missed the first page. He didn't even hear it. So maybe there was a page before that that he didn't hear. And, again, the defense was required to show by clear and convincing evidence that an attorney was there and present at 650. And he was there. And the state did not rebut that, credible as the trial court found evidence. Well, thank you. Time for reply two. Faith. Good morning, Your Honors. Good morning. With respect to the accountability issue. Say your name again, please. I apologize. Jessica Ball, Assistant State's Attorney on behalf of the people. With respect to the accountability instruction, first and foremost, the defense is basing its entire argument on the fact that, on the state's theory. And the state doesn't, the accountability instructions are not tied to the state's theory. The instructions are tied to the evidence, not trial strategy. As long as there is slight evidence in the record to support it, the instruction can be given. How much of the slight evidence in the record is? There's more than slight evidence in this case, Your Honor. We have, first and foremost, I think most importantly, is the fact that there had to be, there was no forced entry into the home. The facts here show that the defendant had help gaining entry into her house. She never would have opened the door to him. She had an order of protection against him. She kept her address a secret from the defendant. She feared him. She thought he was going to kill her. And she knew that he had hired or attempted to hire somebody to do it. She even boarded up the windows of her home to keep him out. Yet, no forced entry into the home. He needed, he had help. He needed to get into that house. How do we know this? There's no forced entry. There's absolutely no way. They never would have opened the door. The evidence was there. The testimony, the door was not open. She kept it locked. The evidence is in the record that she always kept her doors locked, that she never would have opened the door to him, that she boarded up her windows. She's not going to leave her front door unlocked if she's boarding up her windows. On top of that, he said to Chad Larson, I made a plan with my father, not by myself, with my father to kill her with a gun. He mined using a gun. You know, since we're speculating here, since her mother was there and the mother and Mary had a broken ankle and was apparently lying in bed when she was attacked, could the mother have opened the door? Nobody in that family was going to open the door to him. He had made... But even if it's just as common, how would we know that? Because the evidence shows that this is a long-standing history of domestic violence between the defendant, the victim, and members of the victim's family. He made threats to other people in the family. He told everybody there. He told her sister, I'm going to demolish her face. And the people in the house, the family, knew that he had attempted to hire somebody, solicit somebody, to kill her. Couldn't he have rang the bell, hidden, and then she said, who's out there, and then she opened the door? Other things that could have happened to her. Not this victim. And on top of it, the mother-in-law. I thought you meant the mother-in-law we're talking about. The mother-in-law either. The mother-in-law is staying with the child. Wasn't her job bringing the children over so that she would babysit as well? Wasn't there some other children that were coming over that morning? Not at that point, no. They wouldn't be there. She actually, no, no, no. She called and said when she was going to leave and when she would be there. So, no, this was not a time. But there were children coming over to the house that morning. Yes, but they were not there. There was one child that was coming over, and the sister, the mother-in-law's, I'm sorry, the mother's daughter, called and let them know what time to expect them. It was not this time. But it was around that time. It was later. The sister did not get there until after 11. I think you're missing the point of the question. The question is, once the murder is committed, the exact times become very important. When you're just taking a kid over for a play date, it's a different thing. If you say, I expect to be there at 10.30, and you actually get there at 10.15 or 10.10, it's not such a big deal because the kid is just coming for a play date. And I think that that is the question that Justice Connors is asking, and I'm asking as well since we're speculating about how the door got opened and how whoever got into the house and committed these murders got into the house. Isn't it also a theory that since there was a play date expected to arrive around that time, that the mother could have opened the door for the mother of the play date? From the evidence, the sister was not to arrive until closer to lunchtime because she was calling to get their lunch order. So when the defendant arrived at approximately 10.15 or 10.22 or 10.30, no, it was too soon for the sister to get there. But on top of that evidence, we also have the defendant saying he made a plan with his father to commit the crime, to shoot her with a gun, to make dry runs. Did the father say he was at work? The father did say he was at work. However, we also have phone calls coming in later from the father. We have all this evidence preceding the murder where the father was the only person he could trust because he was a bag man for the mob. And we have an abundance of evidence that the defendant sought help in committing these crimes. We can't just disregard that. He was looking for help to commit these crimes. And the GSR, the gunshot residue evidence, alone supports the theory of accountability. The expert said that he could have been standing in close proximity to the shooter. We only need slight evidence to get this accountability instruction. We don't have to prove accountability. Do we have slight evidence? Absolutely. It's there. There's a strong legitimate inference in this case. I think one of the strongest pieces is that the testimony that she never would have opened the door to him. And beyond that, there was an order of protection to keep him away that she kept her address a secret from him. She feared he was going to kill her. She knew about the solicitation. And she boarded up the windows of her home to keep her out. Other than no forced entry. You've had that for 10 minutes now. And if you were there, no eyewitnesses saw him go in. So who knows who opened the door? Forced entry. Like all evidence, it's inferences. Your inference is she would never willingly let this guy in because he wanted to kill her. Makes sense. Move on. Other than his statement he's going to, with his dad to kill her. What else do you have? We've got the fact that he solicited other people. He was looking for help to commit these crimes. He never said he was going to do this alone. He always said he was going to need help or want help. And the GSR evidence on the wrist. He could have been standing next to the shooter. All of these things together, it creates this strong legitimate inference of accountability. It's entirely possible from this evidence that the defendant and the co-offender went there. The co-offender gained entry. The defendant followed inside. The defendant or the co-offender shot both victims, and then the defendant stabbed Mary. There is absolutely some evidence of accountability, making it that the trial court did not abuse its discretion in giving this instruction. And we do not have to prove the identity of the actual killer in that case. We have strong circumstantial evidence that another person was involved, and that's what the case law requires. None of the defendant's cases here hold that the state must identify the actual killer. In Garrett, the problem there was that the evidence proved that the defendant shared a common design with the others to commit an armed robbery, not to commit a murder. Here, the evidence shows that the defendant shared the intent and common design to kill Mary, and his plan was executed accordingly. Perhaps if she was robbed and not murdered, it would be a different story, but that's not what's here. Again, the state doesn't have to argue the theory of accountability. As long as there is slight evidence of it, it goes in. It doesn't matter that the defendant was charged only as the principal. There's no charge, murder by accountability. And the courts allow this type of pleading practice. The state is not asking to expand the law of accountability, just to apply the current state of the law as it exists. All of the evidence on solicitation, that went in, in part, at the request of the defense attorney, the trial attorney, that he wanted to try the solicitation case contemporaneously with the murder case. Is that correct? Yes. And that was as a result of trial strategy. They didn't argue that, so I don't feel... It's in the briefs. Thank you. The other thing that Justice Quinn pointed out is that if the evidence, even if there was an error, it would be harmless if the evidence is sufficient to prove the defendant guilty beyond a reasonable doubt as the principal. And obviously, the evidence is just that. It's there. We don't have... There is no separate murder by accountability jury instruction. I think we can all agree that this case was entirely circumstantial. And what about the defense argument that given the fact that this case was built entirely on circumstantial evidence, you'd better be really sure about the instructions that you're given because the risk of prejudice is great. That's her argument. Well, first, I disagree. I think there is some direct evidence of his guilt here. You have the gunshot residue on his wrist. You've got the blood in his car and the bleach in the car to try to clean it. And the fact that he told Larson that he was going to kill her with a gun with his father. I think that's direct evidence, not just circumstantial there. As to counsel's concern regarding those jury instructions, again, there's no separate murder by accountability jury instructions. There's no separate charge for that. And the cases that she cites were not decided on jury unanimity grounds. They were decided on Illinois' good count rule. Shad v. Arizona, United States Supreme Court case from 1991, says that a jury does not have to agree how the crime was committed. Actus reus unanimity is not required. And that case says, and quotes, in returning general verdicts in first degree murder cases, jurors are not required to agree upon a single means of commission of that offense. Different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. So those cases tell you, along with the Illinois Supreme Court cases, that tell you if there's sufficient evidence to prove him guilty as a principal, there's no prejudice. It's a harmless thing. And counsel is attacking this verdict on nothing but speculation. That can't be done here. There's no basis in the record to even suggest it. As to this issue, the trial court properly instructed the jury on accountability. As for the Internet evidence, the defendant waived this issue on appeal. The defense is attempting to parse out these individual objections to individual pieces of Internet evidence, which is totally improper, especially since all of the evidence was admitted here at trial without the objection that's now urged on appeal. And she's not even suggesting ineffective assistance in this regard. There's no reason to review it under plain error. The evidence of his guilt was overwhelming. There's no structural defect, and there's no logical way for her to establish prejudice. There's no doubt there's a direct nexus between this evidence, the solicitation, and the murders. The court did not abuse its discretion to allow that evidence in. Contrary to counsel's argument, Palo actually supports the state's case. In Palo, there was a lot of Internet evidence that was introduced, approximately 175 pictures, pornographic images, and numerous Internet search terms and search results. That court found that the search terms and the results were properly admitted because they were relevant to show a state of mind, and that the names of the websites were properly introduced without showing their content because clicking to the links on those websites were relevant to prove a state of mind. That case did not hold that a defendant needs to emulate the behavior shown on the website. That's not what the case found. There's no such heightened burden for Internet evidence to have to be admissible, and the defendant concedes that in the reply brief. What he says is that in order for Internet evidence to be admissible, it must be connected to the defendant and the crime. In other words, as we've said all along, it has to be relevant. And here there's no doubt that it is. He admits that those searches are his. They corroborate the state's witnesses, and they're completely related to the crimes charged. The state was absolutely entitled to use this evidence to prove that the defendant was responsible for the murders. The Internet evidence was not even remote. There's a long-standing history of domestic violence between them. I think the question here regarding that evidence has to do with coveted value and prejudicial effect, and that's one of the things they argue. If your case is as strong as you say, would this be prejudicial to throw this in? Why did you need to put this evidence in? Of course the evidence was prejudicial, and the evidence of guilt is going to be prejudicial against the defendant. But the real question is whether that prejudicial effect is substantially outweighed by the probative value. And that's what we focus on, and it is. The probative value here was very high. It establishes a backdrop of the defendant's desire to have Mary killed, and it corroborates all of the state's witnesses. Therefore, the state was entitled to use it, and the prejudicial effect is minimal compared to what the probative value was here. Yes? Counselor, can I ask you, what's the effect of a Miranda waiver? Either signing it or not signing it. It is not the equivalent of invoking the right to counsel. Is that? No. Is there a case law? Yes. In order to invoke the right to counsel, it minimally requires a statement that can reasonably be construed to be an expression of a desire for the assistance of counsel. He never said that. But what does it say on the Miranda waiver, though? It explains all of the rights, but he's not making a statement saying that he wants those rights. And he verbally waived Miranda here anyway. He said that he wanted to talk to the police, not through the assistance of counsel, just to set the parameters of the conversation, saying I'll talk to you about anything else, but I'm not talking about Mary. I understand that. But again, the whole point of rejecting the signing of a Miranda waiver, what effect does that have? None, really? Not in this case. In this case, he verbally waived Miranda. He specifically stated he wanted to talk to the police. You don't need to sign a Miranda waiver to waive Miranda. I'm just wondering, why even have a Miranda waiver? You need to inform the defendant of his rights. And in this case, he knew very well what his rights were, and he previously invoked Miranda in the Niles Police Station a few years before. He knew how to do it. But the signing or non-signing of that really has no effect? Not in this case. Okay, thank you. Not on the facts here. As for the McCauley issue, there is no McCauley violation here. The police told the defendant that his attorney was at the station. They stopped questioning him. They brought the attorney to the defendant and allowed them to meet privately, all within minutes after arriving at the station. The evidence did not establish that attorney was there at 6.50 p.m. This was a question of facts. The trial court made that factual finding that the attorney arrived at 7.25 p.m. The trial court determined that the police version was more credible, and that factual finding is supported by the evidence here, especially where the attorney was not wearing a watch, he could not remember the names of the two desk sergeants, and couldn't even remember if they were male or female. The trial court found the commander's policy was scrupulously honored. Plus, if you sit back and look at it, the defendant's argument doesn't make sense. The detectives would never have taken a break from questioning this defendant if they were trying to rush and inappropriately keep an attorney waiting. And this defense lawyer would never have sat calmly for 40 minutes waiting to talk to his client knowing that he's being questioned. How do you know that? An experienced defense lawyer is going to be jumping up and down saying, I have a right to see my client. That is just as speculative as what your opponents are saying. How do you know that? The protocol in a particular police station, and true, that attorney apparently was an experienced defense lawyer, but how do you know that? I don't think there's anything in the record that suggests what you just said. Sounds good, I agree with you, but how do you know that? I think it's a reasonable inference that can be made. The evidence here shows exactly contrary to what the defendant says. He was not there at 6.50 p.m., he didn't get there until 7.25, and within 10 minutes he was sitting there talking privately with his client. There's no indication anywhere that there was a McCauley violation. Also, the trial court didn't rely on his own opinion to determine that. There was sufficient evidence in the record to show that this attorney could not get from downtown in the Loop to Glenview by 6.50 p.m. What was the evidence that showed that? The evidence was not that he flew out of his office, ran to his car, and sped all the way to Glenview. The evidence was that he had to leave his office, that he had to take the elevator down 19 floors, that he walked, not ran to his car, had to get it out of the parking space, and then sat in rush hour traffic. You know, since we're speculating here, we could speculate that you could get to Glenview from the Loop in an hour at 6 o'clock when rush hour is waning. Not when you have in the evidence that the officers left the defendant's home at 5600 North Richmond at 6 o'clock, and it took them 40 minutes to get there to the station, and you have the attorney starting at 221 North LaSalle, a much greater distance south, getting there in just 10 extra minutes. Isn't the bigger distance from where you are to the expressway? The attorney was right here, right next to the expressway. I mean, isn't it a longer time to get from North Richmond to the Kennedy or even wherever he got to? If we're speculating, I personally think it's worse to be sitting on the expressway with bumper-to-bumper traffic. Well, no, no, I'm just talking about the distance between where they left the house, his parents' home, to get to the expressway. I think it depends on what the traffic was that day. What we know is that the attorney said he was going under the speed limit, and it was a reasonable inference to take from that that it would take him longer, more than a reasonable inference. The evidence is there that it would take him longer to go a further distance to get to the station. More importantly, that factual finding is supported by the evidence in the case and is entitled to deference and review. I asked you before, what is the evidence that you keep saying supports that factual finding other than the judge saying, oh, it couldn't have taken you, you couldn't have gotten there in that time. I may have come to a different conclusion. I've been able to get from downtown to Grandview in that amount of time. So what is the evidence that you keep saying is in the record that supports that finding? In addition to that, we have the testimony from the commander and the detective. The commander is saying that the first page to him went at 7.25. And just to clarify, the first page went to him at 7.25, the co-commander approached him at 7.27, not 10 minutes later, and at 7.30 the commander ended the phone call that he was on with the victim's family, went to the room, the interview room, told him to stop the conversation, made his way back up to the front. The first page went at 7.25. Does that mean that that's when the lawyer first got to the station? Their contention is they didn't react within a reasonable amount of time after Pat Reardon got to the station. That's what they're arguing. And you're saying, well, they paged at 7.25, so that must have been when Reardon got to the station. How do you know that? That's the trial court's finding. He heard the evidence from these witnesses, made those credibility determinations that the attorney did not arrive before that because his policy, the commander's policy, was scrupulously honored and scrupulously followed. This is what they did whenever an attorney came to the station. They didn't have him sit for 40 minutes before paging him. It was scrupulously honored. As soon as that attorney comes through the door, page me. And they did. And admittedly, he said, I didn't hear that first page. Have you been in private practice, counsel? I'm sorry? Have you been in private practice? Have you been to a police station? I have been to a police station, not in the capacity of private counsel. Excuse me. But there is evidence in the record, certainly to support the trial court's finding. And that finding is entitled to deference on review. The point being, there is no McAuley violation. The police did not do anything to keep the attorney waiting and keep him away from the defendant. They met up together, were privately talking within 10 minutes after his arrival. If there are no other questions, the people would rest on their briefs and respectfully request this honorable court affirm the defendant's conviction. Thank you. Ms. Lampos, briefly? Briefly. With regards to Argument 1 of the state, Mr. McAuley was arguing that basically the sole evidence that they had that he must have had help with was entry into the home. And once again, not only were they waiting for the family, they were also waiting for Comcast for two hours. It's entirely possible that you hear a car in the driveway, you see someone approaching, you ring the bell. It's the man you're waiting for, the man who's coming to install your phone. So they were waiting for someone else, someone other, to come and to approach them. That's also just an inference, isn't it? That's all her argument. It's all inference. Who knows? Nobody saw it, so. We don't know who rang the doorbell, but they can't say that it was another person who rang the doorbell. But again, even if somebody rang the doorbell. Both are proper inferences, and it's up to the jury to figure out inferences. Even if someone rang the doorbell, they don't have, it's not enough to make them accountable for the actions of him being the principal when he walks into the door. That just tells somebody they're the principal. So if the dad rang the doorbell, and they see the dad, they're not even worried about the dad. They open the door, up pops Steve, kills him. Then he's the principal. He's not accountable to dad. The vast majority of evidence he's the principal, but he still couldn't have done it without dad. I think dad was a word. The state's never contested that. The state never charged dad. You know, this is just one comment that he made about his dad being a bag man, where his dad was a janitor at an apartment building. You know, he made that comment to Chad Larson. There's no evidence that dad was there. All the evidence suggests he was calling dad, and the state used that to kind of like help me, help me, help me. There's no proof that he had anybody ring the bell. I don't think he needed help ringing the bell. And, again, even if one person rang the doorbell and ran away, if he walked in the room and he killed the woman, he's the principal. He's not accountable to himself. He's the principal in committing the crime. And the state failed to prove that what they need to, which is that he intended to be accountable to someone, to aid, to solicit, to abet someone else. What about the requirement that the evidence that there be a third person just be slight? And your opponent's argument is that there was at least, she thinks there was more evidence, but she said there was at least slight evidence. Can you respond to that? I don't think there's slight evidence. I think the entry proves absolutely nothing. I think that the GSR, the back of his hand, the state— There really was an order of protection. And I think we can all agree that Mary would never have let this guy into her house. But she didn't. She was lying in bed when she was killed. So the mother, who doesn't live there, may not have had the same heightened sense of alarm about whoever it was that was coming. And the Comcast man was coming. So it was expected. And the sister was expected with the play date. So what about all of that? And they also made the comment in their closing arguments that maybe Margaret was a smoker. Maybe she opened the door and went outside to have a cigarette because she wasn't smoking in the home. If that's slight evidence that there was another person there, that's not even evidence of anyone. It could have been maybe he put a puppy in front of the door and rang the doorbell, and she saw a little cute puppy. There has to be evidence of a person. If a neighbor would have seen somebody walking down the street or saw somebody ring the doorbell or a fingerprint on the doorbell or something, that's not evidence. That's, again, pure speculation in order to say you're accountable for a doorbell ringer, although you committed the actual murders. It's not speculation that he tried to hire many people or several people to murder his wife, right? Dr. Chad Larson. That's what they proceeded on, Dr. Chad Larson. He did make comments, ridiculous as they are, about... And that's the argument. It's so stupid. Let's reserve those actions in doing this. We're so stupid. You shouldn't believe it occurred that way. That's an argument. That's an argument. Around a solicitation case? Yeah. Oh, is he saying... No, in any case. Oh. The fact is, bizarre. We've never convicted anybody of anything. Even with the intelligence of criminals, we've never convicted us all. That's very true. Especially solicitors who commit murder for hire. Right. Then they crack that. It's like rocket science. It's stunning. I'm going to hire a stranger to murder somebody. Wow. Yes, and that was the inference that nobody believed him. And, again, for the solicitation case, to prove it, you have to prove that he actually manifested the intent to have this actually done. And I believe one of the witnesses, or the cockroach witness, was that I thought he was maybe in on it with the anger management group. That, you know, there's this whole set-up. Yeah, okay. I've forgotten it. And the second one about buying the gun, that they didn't think that he was... And, again, that is an argument. He was only charged with actually trying to solicit Dr. Chad Larson. But that had ended on October, in the mid-October. And, again, the state's theory, after he gets in trouble, after, you know, Dr. Chad tells the police that he's going to do this himself. He's going to attempt to pull this off himself. That was their theory. That's how they ran with it, all during trial. That's how they presented every piece of evidence to say that he lied about his alibi. They don't need a unanimity as to why it happened. They have cases being sure, saying, you know what, it's harmless there. If there's enough evidence as a principle, it doesn't matter if you're instructed on accountability. There isn't enough evidence as a principle, and they even say evidence isn't conclusive. Why do you need an accountability instruction? Why do you even bother? Because you're arguing there's 12 people off the street who you've never met before in your life. And one of them might be goofing off. Maybe he's mad at his wife. Ah, I think they're setting this poor guy up. That's how it works. But, again, that verdict would not have been permissible under just a straight theory of accountability. Under what case? Oh, I'm sorry. We do have Garrett, which says you have to identify who the killer was. In that case, you have a defendant who made a plan to walk in and rob a store. You're on the hook for attempted robbery. The person gets shot. You have a gun on you. The gun that shot him. I understand. But it's a really complicated area once you get into felony murder. Right. So you can be Washington. You have to identify who the shooter was in order to be accountable for them. And the person is the opposite. Well, Cooper, we knew who the co-defendant was. We knew that there was either identified co-defendant. There'd be a third guy. There'd be some other gangbanger walking down the street. But there were two, and you had a plan with this person. And because of your plan, this person ended up dead. And that didn't happen here. We don't know who Mr. Zirkel planned anything with other than himself. What? Anything else? So just briefly on that, as far as just admitting that this evidence, that the computer evidence was prejudicial. And, again, emulate that PILO says doesn't expand anything. It just is a simple term for connection. And these pieces of evidence, most specifically the GHB and the chemicals and the evidence eliminator, which has, again, just telling them the website, not exposing them to what it actually was, is highly prejudicial and basically made him what their entire theory was is he's a bad man. He wanted this to happen, and it happened. Ergo, it was him. Thank you so much. Thank you for the arguments and the briefs on this very interesting case.